Good morning, Your Honors. My name is Jeff Melching. May it please the Court. I am here today on behalf of the City of Berkeley, the appellant in this matter. If there is one point that is important to drive home this morning and make crystal clear that this Court understands, it is that when Qwest tells you in its briefs, Ordinance 6630 contains exactly the types of provisions that were struck down in Auburn, it is demonstrably and categorically wrong. Auburn looked at a series of factors that were troubling to the Court in that context. They included the existence of a franchising requirement in those cities' ordinances. Obviously a franchising requirement forces telecommunications carriers to go out and essentially negotiate contracts with cities as a prerequisite to providing service in the public rights-of-way. Ordinance 6630 has no franchising requirement, no licensing requirement. It has a ministerial permit process whereby an applicant provides basic information. What are you installing and where? How much capacity will be left after the installation is complete? What's your traffic control plan? How are you going to manage public health and safety issues? It is a ministerial permit process. Likewise, in Auburn, this Court was concerned, indeed characterized as the ultimate cudgel, the existence of unfettered discretion concerning the grant or denial of franchises. The discretion involved in Ordinance 6630 is so non-controversial in this case that Qwest doesn't even challenge the city's discretion under Section 16.11.060, the provision that sets forth the discretion in granting or denying a telecommunications excavation permit. Auburn involved preferential treatment for cities, like access to excess capacity, like requirements that cities get most favored nation status in the application of rates. None of those features are in Ordinance 6630. Auburn required the production of a lot of non-right-of-way-based information as part of the application process and a prerequisite to getting into the right-of-way. This Ordinance does not. I'll go through the application requirements in a moment to illustrate the point as clearly as I can. Auburn expressed concern about a long approval process and the fact that telecommunications companies could be delayed in getting access to the right-of-way. This Ordinance does not. This Ordinance has a provision which says the permit shall issue promptly upon completion of an application. Auburn was concerned about the public hearing requirements that were a prerequisite to getting in the right-of-way. This Ordinance has no such public hearing requirements as a prerequisite to getting in the right-of-way. Virtually all of the features that were of concern in Auburn are non-existent in Ordinance 6630. Well, in Auburn, the Court said the phrase, quote, manage the public right-of-way means control over the right-of-way itself, not control over companies with facilities in the right-of-way. Now, would you agree that there are provisions in this Ordinance that don't have a thing to do with use of the right-of-way but look more to controlling the company? I would not agree with that, Your Honor. Okay, then tell me why the city cares about whether the applicant has complied with all applicable tariffing or de-tariffing requirements enclosed by the FCC and or PUC. That's a fair question, Your Honor, and let me answer it this way. Thank you. Let me answer it this way. You're talking about Section 16.11.070 of the Ordinance, and that provision allows the city to make one determination and one determination only. And it does not govern in any respect Quest's ability to get access to the right-of-way. The determination that it facilitates is, does Quest pay for access to the right-of-way on a fair market value basis for access, or doesn't it pay? That's the only question that provision answers. And frankly, if Quest doesn't like those provisions or finds them burdensome in any way, all it has to do is not certify. It doesn't have to go through that certification process because that's certain. And all it will have to do then is pay compensation. And the compensation requirement is not challenged as invalid under Section 253. That is the full sum and substance of 16.11.070. Now if I could turn to why the city asks those questions. That is a question of State law, because State law requires that common carriers with State-wide franchises not be forced to pay compensation for the use of the right-of-way. So the city is simply asking the question, are the services that you provide common carrier services such that we can't charge you rent? That's a question that is confined to Public Utilities Code Section 7901 and an issue that the District Court specifically declined to exercise jurisdiction over in this case. That is the full... What about then, let's move on to annual recertification? That is part of the same process, Your Honor. Right. Exactly. But they want current rate information. That's right. And infrogation regarding terms and conditions on the services being furnished. All information, copies of all information made available to the public pursuant to the tariffing or de-tariffing related notice requirements of the FCC and or PUC. And the name, addresses, and phone number of each person or entity denied service access to or capacity over the facilities within the 12-month period in May that we're proceeding. And once again, Your Honor... That strikes me as something that the PUC and FCC should be intimately concerned with, but I fail to see why the city isn't regulating the company as opposed to the right-of-way. Well, again, Your Honor, if Quest doesn't want to comply with that, all it has to do is say no. It doesn't have to... Why does it have to expose itself to arguably improper conditions in order to get the benefit of the certification? Well, Your Honor, all these conditions do. First of all, again, all it has to do is say no. It gives itself access to the rights-of-way. It can provide services in Berkeley. It has to pay compensation. It doesn't challenge those compensation requirements. That's the city's argument. But to address your question, the reality is, is that all of these questions are in a more legalistic phrase, walks like a duck and quacks like a duck questions. We're not trying to regulate Quest's common carrier status. We don't have the power to do that. And by the way, it's not Quest's common carrier status. It's the common carrier status of the services that Quest provides. All we're attempting to do is verify that Quest is continuing to provide services on a common carrier basis so that we can know whether we're allowed to charge them rent for the use of the right-of-way or not. And if Quest doesn't like that inquiry, all it has to do is say no and pay the compensation. It's very simple. The difficulty here for the city, Your Honor, is that there is a federal and state regulatory structure that governs whether we can or can't charge compensation based upon the nature of the services provided. And we are simply attempting to have a device to answer that question. What was the purpose of 6608? What were you intending to accomplish? Why was that necessary? 6608, well, the reality was, the base reality of 6608 was that at that point in time, when it was adopted, I believe in early 2001, you had huge proliferation of installation of telecommunications facilities in the right-of-way, all kinds of practices that actually since the slowdown in the economy aren't going on. But the city was routinely getting its streets trenched up by multiple providers, some of which, by the way, weren't even providing services. They were just installing empty conduit underneath the streets to essentially land bank, which is, by the way, the genesis of the question, what common carrier services are you providing? Because if these facility, if these providers were dropping into the right-of-way with empty conduit, then those providers should properly have to pay for that privilege because they're not offering a common carrier service indiscriminately to the public, which is the very reason why Congress and the state of California have seen fit to provide preferential access to providers that want to provide indiscriminate services to the public. So the purpose was, of 6608, was to provide a scheme that could manage all of these installations and decide how the, how the different installations should be treated. Why did 6608 fail? 6608 failed, frankly, because when 6608 was adopted, there was no Ninth Circuit, no Ninth Circuit precedent at all interpreting Section 253. So the city took its best shot at trying to have a reasonable right-of-way management-based ordinance that also didn't impose unreasonable burdens on telecommunications carriers. And what happened? The lawsuit got filed and the very day before the preliminary injunction hearing at which the ordinance was invalidated, this court released its decision in easy, on 6608. Right. But the city took Auburn and the district court's opinion on 6608 to heart, and it came up with Ordinance 6630. And how is 6630 different? Wonderful, wonderful question. And, yeah, I would like to tell you how it's different. Thanks. We're batting a thousand here. We're not stumbling or muddling through records now. We're asking good questions. Go ahead. I believe in the value of encouragement. The 6608 had franchising requirements. This ordinance does not. Again, a ministerial permit process. You want to get in the right-of-way? I'm afraid I'm going to run out of time. So I think you want to know the answer to this question. Okay. 6608 had franchising and licensing requirements. This ordinance does not. Slow down. It's okay. 6608 had what the court characterized as unfettered discretion to grant or deny a franchise. This, again, ordinance doesn't even have a franchise requirement. And the discretion that is exercised in the grant or denial of a telecommunications excavation permit is in section 16.11.060. And I tell you the section number because you can read quests, briefs, both below and on appeal, and you will find they don't even challenge the discretion that is, because there essentially is none. It's a ministerial permit process. 6608 had public hearing requirements. This ordinance, as a prerequisite to getting in the right-of-way, does not. 6608 had a lot of non-right-of-way based information, according to the court, that was sought as part of the application process. This ordinance does not. 6608 had a three-tier permitting process. There was registration of carriers that were in the right-of-way. There was something called a special telecommunications permit. And unless exempt, there was a requirement that parties engage in franchising or licensing. All of that was stripped out of 6608. And 6630 now has the process that I've mentioned probably seven times now, one telecommunications excavation permit process that is ministerial in nature. And 6608 had this common carrier exemption process, which Judge Nelson and I have discussed already. But the fact was, in 6608, you had to make an affirmative demonstration that you were a common carrier in order to be exempt from licensing or franchising. That provision in 6608 was entirely scrapped. And 6630 came back with an optional self-certification protocol that no longer has anything to do with franchising or licensing and answers, once again, only the question, will Quest or won't Quest pay compensation? So if Auburn and 6608 don't provide guidance on what's wrong with 6630, then I'm left to look to Portland. Well, in Portland, you made a fairly clear statement about what constitutes a violation of Section 253A. You said, to determine whether preemption exists under 253A, it is necessary to analyze whether the regulatory scheme in combination has the effect of prohibiting the provision of telecommunications services. You essentially used the text from 253A. And then you identified four factors that you felt were relevant. You culled them from the Auburn decision. One, the nature of the franchise application process. Now I'd like to talk about that application process. This is what it takes to fill out a franchise application and get access to the right-of-way in Berkeley. One, the name and the identity of the applicant. Two, engineering plans and specifications detailing the nature and location of the equipment to be installed. This is basic. You have cable in the ground, gas, electricity. You have all kinds of facilities in the ground. Knowing where they are is integral to being able to manage the rights-of-way. Three, if you're using above-ground facilities and Quest is not, proof that there's access available on the poles to install your facilities. Four, if you're using existing underground ducts, then indication of how much capacity exists pre- and post-installation. Why does the city ask this question? Because the city isn't looking to have serial retrenching of the streets. It results in street degradation, pedestrian safety issues, and traffic control issues. All we want to know is how much space is left so that when the next applicant comes in, we can tell them, you don't have to retrench our streets again. Four, if you're installing new ducts, we want to know how much capacity will be left in the duct after the installation and where they're going to be. Again, for the very same purpose. I'm sorry, I'm up to six. A preliminary construction schedule. Seven, a traffic control plan. Eight, confirmation that you otherwise have authorization to do this. As you know, after Auburn, the city's role in the regulation of telecommunications providers, in your words, is very narrow and circumscribed. Therefore, the city asks the simple question, have you obtained authorizations from whoever else it is that you need to obtain authorizations to be in our rights-of-way? Because we can't regulate you. The least we could ask is, do you have an authorization? And finally, a very narrow catch-all provision that Quest seems to take umbrage with in its briefs. Other and further information related to the public rights-of-way. The words related to the public rights-of-way are written right into the ordinance. That was a change that was made on account of the district court's decision on Ordinance 6608. And why is there a narrow catch-all provision? Because there are different geographic considerations with each installation. There are changing technologies. There are different technologies. And if every time we realized we needed a new piece of information, we had to amend the ordinance, it would actually slow down the process of permitting. So it's eminently reasonable. So ultimately, where does that take us? It takes us into the three other factors from the Portland decision that you considered relevant. They were the requirement to obtain a franchise, which doesn't exist here. The threat of penalties for failure to obtain a franchise, since there's no franchise requirement, there are no penalties for it. There is a penalty provision in the ordinance, like there is for every provision of the city's municipal code, which simply gives the city an enforcement device. But there's nothing controversial about that, so long as the underlying requirements that are being enforced are otherwise valid. And finally, the discretion the city reserves to grant denial to the franchise. Well, there is no discretion, as I've stated. Where does that take us? Very briefly, it takes us to the evidence. Because Quest, I mean, Auburn and Portland and Ordinance 6608, the preliminary injunction decision, don't seem to answer this question. If they answer it at all, they answer it in favor of the city. So we go to the text of the statute, which requires an analysis of the effect of the regulation on the ability to provide services. And looking at that, the FCC has said that it wants credible evidence supported by studies or other descriptions of economic effects of the legal requirements that are the subject of a petition. It's looking for evidence of the effect. Quest hasn't given that to us. They gave you a statement from an employee who said, because of uncertainties and timelines in Berkeley and in Oakland, Quest decided not to expand services. But that testimony relates to the installation of the LBNL facility contract, which was done pre-Ordinance 6608 and pursuant to the court's preliminary injunction, has nothing at all to do with Ordinance 6630. And they gave you testimony from a city employee about how, in Quest's view, the common carrier exemption process was onerous. I say common carrier exemption because the city employee was talking about Ordinance 6608, not Ordinance 6630. So that's the sum and substance of Quest's evidence, which none of it relates to Ordinance 6630. The city has an expert that it hired who looked at the discovery produced by Quest and looked at the requirements in the ordinance and opined that he couldn't discern any adverse or prohibitory effect from the evidence. This is a summary judgment case. So at a minimum, we have disputed issues of fact that warrant remand, especially given how little the district court had to actually say about Ordinance 6630 and what this court said in court. Do you want to save some time for a rebuttal? Yeah, I'll save the remaining time for a rebuttal. Good. No more than two minutes. May it please the Court, David, good night again for Quest. When this case started, Berkeley had a moratorium that prevented Quest from obtaining the permits to serve the LBNL contract. The court enjoined Ordinance 6608 and within three weeks, Berkeley passed this new Ordinance 6630. The real intent of this ordinance in the certification and recertification procedure, which by the way is mandatory, Quest shall comply, was to provide a mechanism for the city of Berkeley to charge rents and right-of-way fees if the city determined that Quest was not offering services on a common carrier basis. That's what's going on here. So the district court judge enjoins 6608 and says, you're acting beyond your narrowly prescribed role in managing the rights-of-way. You have no business regulating the company. I'm enjoining this ordinance, Quest can go forward with this project, and three weeks later, 6630 comes into play, the intent of which is to give the city another mechanism to say, look, if you're not a common carrier, the Telecom Act simply doesn't apply to you. Is that right? If you're not a common carrier, the Telecommunications Act does not apply to you? I believe it is, Your Honor. So aren't they simply saying, we simply want to know whether it applies or not? We want to know whether you're a common carrier? Yes, that's what they're saying. Is that preempted? Yes, it is. Why? How does that prohibit you from providing telecommunications services? Well, a couple of responses. First of all, it is a classic case of a city stepping beyond the proper role of a city and narrowly managing the rights-of-way. We have no problem with the city obtaining reasonable permits, having reasonable permit requirements, paying cost-based fees. But when a city says, you have to show us annually that you are offering services on a common carrier basis? How complicated is that? Very complicated. It's very complicated. If you look at the, as Judge Nelson was focused on, the common carrier exemption procedure, the submission includes all of the services proposed to be offered, all government approvals, including without limitation, approvals required by the California Environmental Quality Act, proof of compliance with all tariffs or de-tariffing requirements, public disclosure to the city and the public of all the material terms in any and all agreements, tariffs, or other documents relating to the terms and conditions for the provision of service, evidence about the construction related to the right-of-way on a common carrier basis, a warranty to the city that Quest will satisfy all common carrier provisions, and then an annual recertification that's also mandatory that requires all information, a certification that all information in the initial certification is valid and true, subject to penalty of perjury, current rate information. Sounds like Sarbanes-Oxley. It does, Your Honor. The name and address of every person and entity denied service by Quest, true and correct copies of all contracts affecting any transfer of ownership, operation, control of facilities, or any portion of facilities without limitation. Now, remember, all subject to a certification that this is true and correct under penalty of perjury, a right of audit the city has to go in and audit the books of the company that pertain to ownership, operation of the company's facilities, and a right to revoke the exemption. Imagine what counsel is, what Berkeley is really asking for, to say the court shouldn't have decided this on summary judgment. Judge Ilston offered two bases for her opinion, and this was an important point on behalf of my client. Either one is sufficient for affirmance, but one is much, much more fundamental and important to us than the other. She said that, essentially, the city of Berkeley has no role attempting to certify Quest's status as a commentator. This is a matter for the FCC and the California Public Utilities Commission. Now, there is good sense in that. No city, to my knowledge, and I've been doing these kinds of cases for five years now, no city has attempted to do what Berkeley is doing here, to my knowledge. Imagine if Quest is building a loop through Oakland, Berkeley, and San Francisco, and all of the cities are attempting to determine whether Quest is offering service on a common carrier basis. Is it really the city's position that Quest should comply with certification procedures in all those cities to have a city counsel through what the city's 30 v. 6 witness described as an exhaustive application process through numerous city departments, and then a city counsel is going to determine whether the CPUC's certificate of public convenience is valid? What if Oakland and Berkeley disagree? Are we going to have a trial in federal district court before Judge Ilston about whether or not the certification is valid? There is an appeal process at the FCC and the CPUC if the city has concerns. But the answer is clearly not to give any city a right to regulate Quest Corporation, and that's precisely what this does. This is not right-of-way management. It's regulation of the company, and it's both legally and practically impermissible. I want to address, just for a moment, the permit requirements. It's not our position that 6630 is exactly like the ordinances struck down in City of Auburn. It certainly is not, nor is it exactly like 6608. But 6630, like 6608, missed the point that not only has the city a narrowly circumscribed and limited role, limited to management of the rights-of-way, but it also has to be sure that it fulfills that role in a way that is not burdensome to the company. Judge McEwen made that point very clearly in City of Auburn, that burdensome application processes and permit processes, lengthy, detailed processes go too far and are stricken down, preempted as a matter of law. If you look at the permit application, the contents, this is for an excavation permit. So Quest wants to go out and fix a line or install some conduit on a corner. It has to go through No. 1, 2A, B, C, D, 3, 4A, B, 5A, B, 6, 7, 8, 9. And then at the end of the day, for each and every permit, such other and further information relating to the right-of-way use as may reasonably be required by the city, with no specification in writing as to what that might entail. Violation of this mandatory requirement gives rise to civil and criminal penalties. Violation of the certification requirement. Does the city have any authority whatsoever to control digging in its streets in the Prowse? Absolutely, Your Honor. Right. Absolutely. Otherwise, companies are out there digging up streets right and left. I agree. And so this issue on the excavation permit is really, it's not a question of whether the city has a right to require a permit. It's how they've gone about it. It's a question of going way too far. I mean, when you look at this, Quest has to supply artist renderings or color photographs. Is there somewhere a statute that you would accept that gives the city the authority to control digging in the right-of-ways that's not burdensome like Quest? There's got to be something somewhere. Absolutely, Your Honor. There are many. Quest complies with permit requirements day after day after day. Many cities have a simple excavation permit requirement. You come in. You see the city clerk. You tell them you want to build on 4th and Cherry. You pay a permit fee that covers the city's cost, and you walk out with the permit. You tell them where you're placing your facilities. You send out people to make sure that you're not cutting water lines and power lines, and you go forward. This is not that. And what Judge Elston is saying in this ordinance, 6630, is you just don't get it, Berkeley. You don't get it. It's not your role to go this far. Permit, yes, but not with nine subsections that end with the city manager can require anything more that they want. And if you fail to comply with the mandatory requirements, you're subject to criminal penalties. So Quest has put, in this case, the irony of these two cases being heard back-to-back. And, Your Honor, I've had the opportunity of litigating many of these cases, including Santa Fe, Portland, City of Auburn, Portland on remand. The irony of this is that this ordinance is bad enough. The common carrier certification procedure is a disaster. This pales by comparison to the Tucson ordinance. If you look at the Tucson ordinance, the provisions in that ordinance go far beyond right-of-way management. The final point I would make about the form of decision this Court might make here is this. Judge Ilston found, first of all, I went in on a 12C motion following the guidance of Auburn and said, you can decide this is a matter of law. The ordinance goes too far. She said, no, I want to allow for discovery. We had extensive discoveries. We have in Tucson in many cases. And it was heard on cross motions for summary judgment. She found two things. She found, number one, it's not your role, Berkeley. And, number two, there is no evidence in the record that these services are not offered on a common carrier basis. The City's own 30B6 witness acknowledged that. We quoted that testimony. Very important, I think, that the Court's decision, if the Court affirms Judge Ilston, focuses on the more fundamental of the two issues. Because if this Court rules that the evidence was not sufficient to raise a question of fact as to whether or not these are common carriage services, I fear that other cities will take heart from that and think that, you know, Berkeley did have a role, they just didn't have the evidence in that case. I think it's important to quest my client to say emphatically, the City does not have a role here. This is a matter of statewide concern and federal concern. It's a matter for the CPUC and the FCC, not for any city. Not for the City of Berkeley. Thank you. About two minutes of rebuttal. I think I have two general points that I want to reinforce, take it back three. The first is, in addition to there not being any evidence that the requirements actually impose a burden on Quest or any other provider's ability to provide any telecommunications service, we've demonstrated, and I won't repeat it because it's in our briefs, at length, that these are really right-of-way management-based issues. Mr. Goodnight can tell you about there being nine subsections, nine pieces of information that need to be provided as part of the application process. Frankly, I don't see, and I hope the Court doesn't see, how we can just count up the number of provisions and decide that that is a burden that violates federal law. I think more ought to be required. And really the question that is left after Auburn and Portland, which dealt with discretion that was too broad and issues that could, as a matter of law, be determined to be violations of Section 253A is, what's the test? What's the evidence that is going to be necessary to demonstrate a violation of Section 253A? We understand that our role is narrow and circumscribed per Auburn, but how do we know when we've gone beyond it? And frankly, one of the most frustrating... You start making open-ended determinations as to who's a common carrier and who's not using this kind of discrete and excruciating detail when it really is none of your business, according to federal law. Well, the problem with that, Your Honor, is that it is our business, and if they're not a common carrier, they're subject to payment of compensation. You claim they aren't. No, we don't claim they aren't. We claim we can ask. All we claim is that we can ask. And what if you say, well, look, we've looked at all of your stuff, and even though everybody else agrees you're a common carrier, we don't? Then we have a dispute. But I can't forecast the future. All I can say is that federal and state law tell us it makes a difference whether these folks are a common carrier or not, and Quest is offering to this Court the position that we can't ask that question so we can't know how to regulate them. Frankly, also... It seems that you might be able to ask it, but not in this way. Well, all we ask for, Your Honor, is certification that they are walking like a duck and quacking like a duck. That's it. It's a certification process. If this Court believes that that process is too burdensome, even though the result of Quest's determination not to comply with that process is just that it pays compensation that isn't illegal under federal law... That's not seducing me, that argument. It's not getting you anywhere with me. Well... They have the option of just violating it and just paying their way out of it. Even if you're not persuaded by that, the reality is that if you don't like Section 16.11.070, just cross it out. We have a severability analysis. We'll go back to the drawing board on 16.11.070. The problem with the district court's opinion is it doesn't provide us one iota of guidance outside of this 16.11.070 issue that you're talking about, Judge Trott, about what's wrong with all of these other provisions of the ordinance that are clearly right-of-way based. And it doesn't give anybody any guidance about what type of evidence would be required to make a showing in a section. What did you do with 16.11.260 in the district court, the severability provision? Did you suggest to the district court that... We did. You didn't? We did. We did that at the preliminary injunction stage. We did that. And the judge rejected it. She said, as in the Auburn ordinance, that it would result in a Swiss cheese approach to the ultimate ordinance. But the fact of the matter is that if 16.11.070 is what troubles you, you can take out the common carrier exemption process, and the rest of it works just fine. So I would urge you to look hard at severability if that's where you're headed. Okay. Thank you. Thank you. Thank you for the argument. We appreciate it. This matter will be submitted along with the earlier quest versus city of Tucson.
judges: Trott, T.G. Nelson, Paez